N. Thane Bauz, Bar No. 188439
TBauz@perkinscoie.com
PERKINS COIE LLP
11988 El Camino Real, Suite 200
San Diego, CA  92130-3334
Telephone:  858.720.5700
Facsimile:  858.720.5799

Attorneys for Plaintiff

PHILIPPE CHARRIOL INTERNATIONAL
LIMITED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILIPPE CHARRIOL INTERNATIONAL LIMITED,<br><br>                    Plaintiff,<br><br>        v.<br><br>A'LOR INTERNATIONAL LIMITED,<br><br>                    Defendant. | Case No. **'13CV1257 MMA BGS**<br><br>**COMPLAINT; AND DEMAND FOR JURY TRIAL** |

1    Plaintiff, Philippe Charriol International Limited ("PCI"), an Isle of Man

2    corporation with a representative office in Geneva, Switzerland, by its counsel,

3    Perkins Coie LLP and Wuersch & Gering LLP, brings this action against

4    Defendant, A'lor International Limited ("A'lor"), a California corporation, alleging

5    the following:

6                              **PRELIMINARY STATEMENT**

7        This action is for trademark counterfeiting and trademark infringement in

8    violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, by A'lor, PCI's licensee

9    and distributor under an October 1, 2010 Exclusive Jewelry License Agreement

10   (the "Jewelry Agreement") for the licensing and distribution of the internationally

11   known CHARRIOL brand of jewelry; for false designation of origin, passing off,

12   and unfair competition pursuant to 15 U.S.C. § 1125(a); trademark dilution

13   pursuant to 15 U.S.C. § 1125(c); breach of the Jewelry Agreement; unfair

14   competition under California law; unjust enrichment; and for related common law

15   claims.

16       PCI seeks injunctive relief, an accounting, compensatory damages, trebling

17   of the damages, attorneys' fees, and costs.  Unless A'lor is enjoined from (i)

18   developing, promoting, and selling an infringing collection of jewelry and jewelry

19   pieces based upon PCI trademarked designs which compete or will compete against

20   PCI and diminish the reputation of the CHARRIOL brand, directly harming

21   CHARRIOL and creating confusion regarding whether CHARRIOL and A'lor are

22   the same; (ii) offering for sale or selling CHARRIOL jewelry re-branded as "Alor"

23   jewelry in and/or outside the territory designated in the Jewelry Agreement; and

24   (iii) misrepresenting CHARRIOL Products (as defined in Article 1.5 of the Jewelry

25   Agreement) outside the Territory designated in the Jewelry Agreement as affiliated

26   with A'lor's own products in order to boost A'lor's name and reputation outside the

27   Territory for A'lor's own product sales, PCI will suffer further irreparable harm to

28   the CHARRIOL brand, image, and reputation.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                    -1-

**JURISDICTION & VENUE**

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 1338(b), and 15 U.S.C. § 1121, because this lawsuit arises from claims for trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, and for dilution and infringement for false designation of origin and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and (c).

2.      The Court has supplemental jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367(a) and § 1338(a)-(b).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because A'lor is located in the District comprising the Southern District of California and a substantial part of the events or omissions underlying the asserted claims arose from the Southern District of California.  There is no other venue among the federal courts that has a stronger relationship with the facts and circumstances of this matter.

4.      Pursuant to Article 25 of the Jewelry Agreement, the parties consent to venue in the County of San Diego for disputes arising under the Jewelry Agreement.  While not all of the claims asserted in this pleading arise under the jewelry Agreement, no other court or jurisdiction has a greater interest in the facts and circumstances of this matter.  The parties also consent to the application of California substantive law to controversies or claims arising out of or relating to the Jewelry Agreement.

**THE PARTIES**

5.      PCI is an Isle of Man corporation located at Clinch's House, Lord Street, Douglas, Isle of Man IM99 1 RZ, British Isles.

6.      PCI's principal place of business is Rue Le-Corbusier 12, CH-1208 Geneva, Switzerland.

7.      A'lor is a California corporation with its principal place of business at 4330 La Jolla Village Drive, Suite 100, San Diego, California 92122.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                    -2-

8. Personal jurisdiction exists over A'lor because A'lor is located, and conducts business in Southern California, namely, San Diego, and avails itself of the privileges and protections of the laws of the State of California, such that the Court's jurisdiction over A'lor does not offend traditional notions of fair play and due process.

9. Since 1992, A'lor has been a licensee and distributor of CHARRIOL Products (defined under Article 1.5 of the Jewelry Agreement), including jewelry.

## FACTS COMMON TO ALL ALLEGATIONS

### The CHARRIOL Brand and Design

10. PCI is the creator and owner of the worldwide luxury brand, CHARRIOL, a brand of watches, jewelry, leather goods, and accessories sold in more than 60 countries.

11. CHARRIOL is recognized by the watch and jewelry industry, trade, and consumers as being an exclusive luxury brand.

12. The CHARRIOL name, brand, and reputation is synonymous with high-end luxury, and the brand is recognized by consumers as a luxury brand that is sold in the finest jewelry, watch, department stores, boutiques, and shops located throughout the world.

13. The CHARRIOL brand includes various jewelry and watch collections each year, each of which are unique, but generally share a distinctive look incorporating a nautical rope design, to which Philippe Charriol, the founder of PCI and CHARRIOL, added a classic modern twist; that is, CHARRIOL replaced precious metal with stainless steel cable enhanced with 18kt yellow gold.

14. CHARRIOL Products generally enjoy a sporty cable design and appearance that target men and women with any clothing style and for any wearing occasion.

15. The first CHARRIOL boutique emerged in Hong Kong in 1990, and other boutiques followed with designs, collections, styles, product mix, and

COMPLAINT; AND DEMAND FOR JURY TRIAL

-3-

1   advertising all personally handled and overseen by Philippe Charriol and the PCI

2   professional team based in Geneva, Switzerland.

3        16.    Since the introduction of the CHARRIOL brand and Products,

4   CHARRIOL "Corners" in upscale jewelry shops throughout the world brought the

5   brand to an increasing international market.  In just over two decades, a worldwide

6   network of greater than 600 CHARRIOL shop-in-shops and stores populate the

7   retailing landscape.

8        17.    The CHARRIOL brand of luxury Products reflect an active, changing

9   lifestyle and values that are attractive to women and men who prefer the look of the

10  distinctive cable design, along with cable-inspired watches and jewelry which

11  reflect the CHARRIOL vision of Products.

12       18.    CHARRIOL collections are generally inspired by, and adopt a

13  signature cable design that resembles the ancient Celtic approach.

14       19.    CHARRIOL grew from a 1983 initial launch of a single cable

15  collection, to collections today in watches and jewelry featuring families of cable

16  jewelry that reflect the signature cable inspiration, and wide families of cable

17  jewelry of 18kt gold and diamonds.

18       20.    In 1999, CHARRIOL expanded the collection, making available new

19  features such as colored stainless steel cable.

20       21.    Since its inception in 1984, CHARRIOL has used cable as a distinctive

21  element of its designs and has always found inspiration from the Celtic art, leading

22  Philippe Charriol SA Corp. to register the trademark, CELTIC on March 27, 1992

23  (Registration No. 1856696).

24       22.    As an example of A'lor's brazen disregard of the CHARRIOL brand,

25  reputation, and the Jewelry Agreement, A'lor on February 3, 2004, without

26  informing PCI and without PCI's authorization, applied for registration of the

27  trademark, CELTIC NOIR (Registration No. 2809864) to name a collection of

28  CHARRIOL jewelry designed with colored cable.

COMPLAINT; AND DEMAND       -4-
FOR JURY TRIAL

23. PCI disapproved of A'lor's registration but did not oppose the registration because, under the parties' Jewelry Agreement, A'lor could not utilize the trademark for products other than CHARRIOL jewelry.

24. A'lor presently offers CELTIC NOIR jewelry on A'lor's website pages (www.alor.com) which displays A'lor's own jewelry, in violation of Jewelry Agreement Articles 2.4 and 4.4.

25. In 2006, A'lor attempted to register the trademark, CELTIQUE, but PCI persuaded A'lor to abandon the registration because PCI owns the trademark, CELTIC, and A'lor acknowledged the confusion that would have existed with regard to the similar marks representing CHARRIOL jewelry.

26. PCI and/or Philippe Charriol SA, controlled by PCI, registered, controls, or holds numerous United States trademarks concerning fragrance, eyewear, writing instruments, and leather goods, including: C Charriol (3793674; fragrance); Charriol (2398922; eyewear, writing instruments, leather goods); Philippe Charriol C (1640486; leather goods); Philippe Charriol (1826190; eyewear); St. Tropez (watches); and the following trademarks for jewelry and watches: Actor (2951879); Celtica (3537333); St-Tropez (4051182); Colvmbvs (2723047); Charriol (2398922; 2231424); Celtic (1856696); cable nautical rope design (1568917); and metallic nautical rope design (1584554) (individually, a "Trademark"; collectively, the "Trademarks" or "PCI Trademarks" or "CHARRIOL Trademarks"). True and correct copies of the federal registrations of the PCI Trademarks are attached hereto as Ex. A.

27. Each of the PCI Trademarks is valid, subsisting, uncancelled, alive, and unrevoked.

28. Continuously since their registration, PCI or its licensee has used the Trademarks in connection with jewelry sales, advertising, marketing, distribution, and/or promotion.

---

COMPLAINT; AND DEMAND FOR JURY TRIAL

-5-

29.     PCI distinguishes the Products from other products and items offered by other companies which engage in the sale and design of jewelry by, without limitation, prominently displaying the PCI Trademarks on the Products or as part of advertising, marketing, or promotional materials distributed throughout the United States and Canada.

30.     The Trademarks have been prominently displayed on promotional materials distributed throughout the United States and have appeared in print, motion, social media, and other advertisements for many years.  In addition, the CHARRIOL cable nautical rope design Trademark is used throughout the collections of CHARRIOL jewelry and inspires such jewelry and watches under the CHARRIOL collection of Products.

31.     As of the date of this Complaint, PCI is actively engaged in expanding its use of the Trademarks and its signature cable design jewelry throughout the world.

**CHARRIOL U.S. Distribution**

32.     PCI sells, distributes, markets, and promotes its CHARRIOL Products worldwide through distributors or licensees who are charged with developing and building the brand and CHARRIOL image and reputation in accordance with PCI's design, marketing, and sales approval.  Each of PCI's agents, distributors, and licensees is an ambassador to the CHARRIOL name and brand, and charged with building customer loyalty.

33.     For the United States and Canadian markets (the "Territory" pursuant to Jewelry Agreement Article 1.6), PCI entered into the Jewelry Agreement with A'lor, which replaced a 1992 agreement under which A'lor was granted an exclusive license to use and employ, among other things, certain PCI registered trademarks.  A true and correct copy of the Jewelry Agreement is attached as Ex. B.

34.     The Jewelry Agreement authorized A'lor to design, market, promote, and distribute the "Products," defined at Jewelry Agreement Article 1.5 as *"jewelry*

*bearing the Trademark [defined at Article 1.1], designed and manufactured by Licensee [A'lor], subject to Licensor's [PCI] exclusive approval and consent . . ."*

35.  "Trademarks" are defined in Jewelry Agreement Article 1.1 as the trademarks specifically identified in the Jewelry Agreement on "Schedule A" (CELTIC, CHARRIOL, COLVMBVS), but also *"all other trademarks whether registered or by common law or usage which may or may not be registered but to which marks are owned or controlled by [PCI]."* Thus, Trademarks as defined in the Jewelry Agreement and as defined in this Complaint include all trademarks of PCI or its agents or related entities whether registered or not registered with the USPTO or whether by common law.

36.  The objective of the Jewelry Agreement was to authorize A'lor to design, produce, market, and promote CHARRIOL jewelry and PCI Trademarks in the Territory only, and to distribute the Products in the Territory only, building upon the CHARRIOL name and brand, and further developing the CHARRIOL name, brand, and reputation.

37.  Similar to a distribution agreement, the Jewelry Agreement authorized A'lor to become the U.S. and Canadian licensee of PCI with regard to CHARRIOL jewelry, and to design, manufacture, and market CHARRIOL jewelry in the Territory, to distribute the jewelry throughout the Territory, and to pay PCI royalties on sales of the jewelry.

38.  A'lor also is a sales representative under an October 1, 2010 Exclusive Sales Representation Agreement with PCI which covers the Caribbean territory (the "Caribbean Jewelry Agreement").

**A'lor's Affirmative Obligations Under the Jewelry Agreement**

39.  Jewelry Agreement Article 2.1.b requires A'lor to advertise, market, and promote the Products in the Territory, *"and to promote the good will and build and preserve the reputation, standing, good will of the CHARRIOL name and*

---

COMPLAINT; AND DEMAND FOR JURY TRIAL

*brand.*" Article 2.1.b therefore required and requires A'lor to take affirmative steps to promote and protect the CHARRIOL brand, fame, reputation, and standing.

40.     Jewelry Agreement Article 2.1.b also obligates A'lor to not *"allow any activities or conduct which shall harm or have the potential to harm or damage the CHARRIOL name or brand or reputation or standing."*

41.     Article 2.1.b therefore required and requires A'lor to take affirmative steps or to prevent or avoid any activity or conduct which may have the effect or result of damaging the CHARRIOL brand, name, reputation, or standing.

42.     Jewelry Agreement Articles 1.5, 2.2, and 4.1 provide that all Product designs by A'lor are subject to prior consent and written approval by PCI. That means, any product designed by A'lor, if the product bears a Trademark or bears the signature cable CHARRIOL design, requires the approval of PCI before such product may be produced, marketed, distributed, or sold by A'lor.

43.     Indeed, under the Jewelry Agreement, no jewelry design by A'lor for its own benefit (A'lor is authorized under Jewelry Agreement Articles 3.1.b and 4.4 to manufacture and sell its own, non-competing jewelry) is authorized to bear a Trademark such that the A'lor product incorporates any CHARRIOL design element or benefit (such as cable).

44.     Jewelry Agreement Article 2.3 restricts the use by A'lor of the CHARRIOL name and Trademarks, including that the CHARRIOL name may be used as part of A'lor's corporate name *"to indicate that it is 'doing business as CHARRIOL USA,' but shall not otherwise use that mark as part of [A'lor's] trade name or corporate title."*

45.     Jewelry Agreement Article 2.4 provides that A'lor *"shall not use in its business in the Territory any other marks or intellectual property so resembling the Trademarks as to be likely to cause confusion or deception."*

46.     Article 2.4 therefore prevents A'lor from using in A'lor's own business, particularly A'lor business of designing, marketing, and selling jewelry

under the "Alor" name and brand, anything resembling the distinctive CHARRIOL cable design appearance such that customers may be confused as to the origin or design of the CHARRIOL or Alor jewelry.

47.     Jewelry Agreement Article 2.4 provides that A'lor *"shall not co-mingle, use, refer, adopt, or employ the Trademarks or the CHARRIOL name, depiction, or likeness with any other commercial or business enterprise, venture, promotion, or activity not contemplated or authorized . . .without the express written authorization of [PCI]."*

48.     Article 2.4 therefore prevents A'lor from using in A'lor's own business anything resembling the distinctive CHARRIOL cable design appearance such that customers may be confused as to the origin of CHARRIOL or A'lor jewelry.  That means, no matter the extent to which A'lor used or uses cable design as part of a CHARRIOL jewelry collection, A'lor cannot use cable design or cable-inspired products for A'lor's own products.  Indeed, the Jewelry Agreement forfeits any right to use cable design in A'lor products which compete against PCI or lead to customer confusion; any such use by A'lor is an infringement of PCI Trademarks and a breach of the Jewelry Agreement.

**The Parties' Contractual Relationship**

49.     Jewelry Agreement Article 3.1 contemplates that PCI designs and manufactures its own product line, but at the same time, Jewelry Agreement Article 3.2 requires PCI to exclusively market and sell CHARRIOL in the Territory through A'lor.

50.     Articles 3.2 and 4.9 also authorize PCI to operate its own physical or on-line stores in the Territory and to sell the Products royalty-free in the Territory through such commerce.

51.     Under Article 4 of the Jewelry Agreement, A'lor is required to submit designs to PCI for approval, seek such written consent from PCI for such designs,

1  and then engage in the manufacture and sale of such approved designs at A'lor's
2  sole cost and expense.

3      52.    There is no authorization under the Jewelry Agreement for A'lor to
4  create CHARRIOL Products or products bearing PCI's Trademarks without the
5  express written approval of PCI.

6      53.    Similarly, there is no authority under the Jewelry Agreement for A'lor
7  to create A'lor products that copy, adopt, use, reflect, or incorporate the design of a
8  CHARRIOL Product or the cable design that is the signature of CHARRIOL; that
9  is, the Jewelry Agreement prevents A'lor from creating products for A'lor's own
10  use other than CHARRIOL Products which adopt, use, reflect, or incorporate cable
11  design.

12      54.    As a licensee under the Jewelry Agreement, the parties' relationship is
13  not the common manufacturer - distributor type, but a model in which A'lor
14  develops – on its own and/or with the assistance of PCI – jewelry designs inspired
15  from the CHARRIOL cable concept, seeks PCI approval for such designs, and then
16  engages in manufacturing the product for distribution and sale through A'lor's
17  dealer network in the Territory, all at A'lor's cost and expense.

18      55.    Article 8 of the Jewelry Agreement provides that A'lor shall remit
19  royalty payments to PCI based upon sales, with the schedule of such payments set
20  forth in Articles 8.1-8.5.

21      56.    Under Articles 4.1 and 4.4 of the Jewelry Agreement, PCI has the
22  authority to reject jewelry designs submitted by A'lor, and if such designs are
23  rejected, A'lor is authorized, subject to Article 3.1.b, to manufacture and distribute
24  the subject design under A'lor's own name, provided that such product, packaging,
25  product trademark, promotion, and advertising is sufficiently distinctive to avoid
26  customer confusion in the marketplace with the Products and Trademarks as
27  defined in the Jewelry Agreement.

28

COMPLAINT; AND DEMAND
FOR JURY TRIAL                    -10-

57.    There is no basis under Article 4 of the Jewelry Agreement for A'lor to engage in the promotion, marketing, or sales of Alor jewelry inside and/or outside the Territory, which jewelry is based upon CHARRIOL's cable design or which copies CHARRIOL Products.

58.    Further, Article 4.4 specifically prevents A'lor from manufacturing, selling, promoting, or going to market with any product, whether such design was accepted or not accepted by PCI, *"using cable or other material distinctive of [CHARRIOL] products."*

59.    That is, A'lor is contractually prevented from developing its own A'lor or Alor lines which copy CHARRIOL Products or collections and/or which adopt the distinctive cable design or appearance that is the signature of CHARRIOL Products.

60.    When combined with Jewelry Agreement Articles 2.1.b, 2.3, and 2.4, Article 4.4 completely prevents A'lor from selling products – no matter their origin or derivation – using a cable design or other materials or appearances unique to CHARRIOL.

61.    Article 4.4 was specifically negotiated between the parties because A'lor, at the time of the Jewelry Agreement, was a designer, manufacturer, and distributor of its own jewelry throughout the Territory, and the parties contemplated that even if A'lor-crafted designs for CHARRIOL jewelry were rejected by PCI, A'lor could not take such designs to market, and could not manufacture a similar design, specifically cable or other materials distinctive to the CHARRIOL appearance, look, and feel of jewelry.

62.    Indeed, it was a specific benefit of the bargain of the Jewelry Agreement that A'lor was contractually prevented from manufacturing, selling, and distributing cable jewelry under the A'lor or Alor name or a different brand, as no matter the jewelry lines of A'lor, CHARRIOL could not face competition from

A'lor inside or outside the Territory for cable-inspired jewelry, which is distinctive to CHARRIOL.

63.     A'lor is contractually prevented under the Jewelry Agreement from manufacturing, distributing, and selling cable jewelry for its own benefit, or any product which includes, adopts, or incorporates a cable design or cable in the design, look, feel, appearance, attribute, manufacture, or performance of the A'lor product.

64.     Similarly, PCI is prevented under Jewelry Agreement Article 4.9 from directly or indirectly manufacturing or distributing in the United States A'lor-designed products, an obligation PCI has honored without fail or deviation.

65.     These restrictions were intended by the parties to allow PCI to exercise tight and unfettered control over how the CHARRIOL cable design, name, appearance, image, and brand was used and promoted by A'lor, and to prevent A'lor, a putative jewelry competitor, from selling under its own name or a different name cable-inspired jewelry.

66.     A further element of control PCI has over its Trademarks and how the CHARRIOL name and brand is used by A'lor is contained at Article 7.1, which provides that A'lor is required to *use the Trademarks precisely as directed by [PCI] and shall observe any reasonable directions given to [A'lor] as to colors and size of the representations of the Trademarks and disposition thereof on the Products or their packaging.*

67.     Consistent with these Article 7.1 requirements is the obligation of A'lor under Article 7.2 to secure PCI's written approval for advertising material; that is, PCI retains the right to approve all advertising materials created by A'lor, and A'lor is not authorized to create, use, or implement advertising without PCI's approval.

68.     Jewelry Agreement Article 7.2 also provides that all *"advertisements shall carry statements making clear that [A'lor] is the exclusive licensee for the Products in the Territory."*

69.     Consistent with the Jewelry Agreement reverting control over advertising to PCI, the advertising developed by A'lor is required to be professional, of course, but also under Jewelry Agreement Article 7.2 *"to develop and inspire customer confidence and loyalty in the CHARRIOL brand and name."*

**A'lor's Planning to Compete Against PCI**

70.     Rather than acting as a partner and contract licensee under the Jewelry Agreement, A'lor has instead started to take increasingly aggressive steps to build and generate name recognition for its own line of jewelry at the expense of the strength of the CHARRIOL name and brand.

71.     In isolation, these steps may appear to be common Jewelry Agreement breaches and owner-distributor disputes, but A'lor's recent commercial activity confirms that A'lor is using the Jewelry Agreement (and its relationship with CHARRIOL) to increase and build prestige and name recognition for its own jewelry lines at the expense of PCI.  That is, A'lor is using the CHARRIOL name and brand to build its own existing brand to compete against PCI inside and outside the Territory.

**A'lor's Passing Off and Trading Upon CHARRIOL's Name in Advertising**

72.     For instance, in 2011, A'lor starting using the following as part of its CHARRIOL advertising campaign (hereinafter, the "A'lor Logo"):

ALOR$^{TM}$

EXCLUSIVE LICENSEE OF CHARRIOL$^{®}$

CABLE & 18KT GOLD JEWELRY

73.     The Jewelry Agreement conveys the right to A'lor to use PCI Trademarks under Article 2.1, and A'lor is obligated to act as an *"ambassador"* of

COMPLAINT; AND DEMAND
FOR JURY TRIAL
-13-

PCI under Jewelry Agreement Article 2.1.b.  But A'lor is not authorized to act as its own ambassador with regard to advertising using the PCI Trademarks.

74.     Similarly, Jewelry Agreement Article 2.4 prevents A'lor from using any other marks in its PCI-related business, including using an "A'lor" or "AL-OR" mark, which tends to cause dealer and customer confusion or deception.  The restrictions under Article 2.4 include any A'lor marks.

75.     AL-OR International Ltd. filed a January 12, 1990 application for a trademark, "AL-OR" which was registered on June 18, 1991 under Registration No. 1648103, with products claimed: IC 014, men's and women's jewelry.  This registration was cancelled on June 29, 2002.

76.     On July 12, 2011, a trademark application for "ALOR" was filed, and on March 20, 2012 registered (Registration No. 4114443), by ALOR INTERNATIONAL Ltd., not by A'lor, its trade name at the time, with the registrant's goods and services defined as *"Jewelry and watches; Jewelry; Leather jewelry and accessory boxes; Mechanical and automatic watches; Metal wire for use in the making of jewelry, namely, jewelry cable; Stainless steel jewelry bracelets; Watches and jewelry.  FIRST USE: 19800712*."  Neither A'lor nor ALOR ever had a first use in 1980.

77.     Thus, merely nine months after the Jewelry Agreement with PCI, A'lor applied for a trademark enabling A'lor to conduct business with its own products that are the same as the CHARRIOL Products that A'lor is contractually obligated to design, manufacture, and sell under the Jewelry Agreement, violating Articles  2.4, 3.1.b, and 4.4 of the Jewelry Agreement.

78.     Moreover, when A'lor first sought a trademark for "AL-OR" in 1988, the mark was located in an oval stamp with the tagline, "architects of jewelry," which copied the then existing tagline of CHARRIOL watches, the "architects of time."

79.   Alor International on or about July 12, 2011 renewed a registration of "Alor" as a trademark.

80.   The bold, aggressive, and prominent display and depiction of the "Alor" or "A'lor" mark alongside, near, or in combination with PCI's Trademarks as part of a CHARRIOL advertising campaign causes dealer and consumer confusion, leaving consumers wondering whether A'lor and/or CHARRIOL is the name behind the product.

81.   A'lor often displays the A'lor Logo or "ALOR" as large as nearly twenty-five percent (25%) of the size of the CHARRIOL name and logo, which violates Articles 2.1.b, 2.3, 2.4, 2.5, 7.1, 7.2, and 7.2.a of the Jewelry Agreement.

82.   A'lor's registration of the mark, "ALOR," referring to prior registration 1648103, with products claimed: IC 014, jewelry and watches; leather jewelry and accessory boxes; mechanical and automatic watches; metal wire for use in the making of jewelry, namely jewelry cable; stainless steel jewelry bracelets; watches and jewelry, are the same Products defined in Jewelry Agreement Article 1.5.

83.   A'lor's 2011 registration of "ALOR" as a trademark did not immediately signify A'lor's mischievous intentions, but when A'lor began boldly and prominently including its name in CHARRIOL marketing, the A'lor Logo – which advertising is contractually required by A'lor under the Jewelry Agreement – and starting engaging in other commercial activity described below, it started to appear that A'lor was planning something more than simply distributing its products at the same time A'lor was PCI's licensee in the Territory:  A'lor was using the CHARRIOL name, reputation, fame, and brand to strengthen its own name in the industry and in the minds of consumers.

84.   A'lor's prominent and robust display of the A'lor or "ALOR" name and the A'lor Logo alongside CHARRIOL print and other advertisements is an improper use of A'lor's mark and violates Jewelry Agreement Articles 2.1.b, 2.3,

COMPLAINT; AND DEMAND FOR JURY TRIAL

-15-

2.4, 2.5, 7.1, 7.2, and 7.2.a.  Examples of A'lor's improper print and other advertisements displaying the A'lor Logo are attached hereto as Ex. C.

85.    But more important than Jewelry Agreement breaches, A'lor is seizing upon the strength of the CHARRIOL name and brand to build and expand A'lor's name and image, and doing so through advertising that A'lor is contractually obligated to undertake under the Jewelry Agreement.  That is, A'lor is trading – and treading – upon the fame, goodwill, name, and reputation of CHARRIOL's brand at PCI's expense to build the A'lor and "ALOR" name and brand.

86.    Not only is this improper activity a violation of law and an infringement upon the Trademarks, but such misrepresentations are dangerously harming PCI through the devaluation and dilution of the CHARRIOL name and brand, while at the same time confusing customers and dealers who sell CHARRIOL and A'lor or Alor jewelry.

87.    There is no authority under the Jewelry Agreement for any A'lor mark to be used or commingled with PCI's marks, and PCI has not approved such advertisements as required under Article 7.2.  To the contrary, PCI has objected to A'lor so prominently displaying the A'lor and "ALOR" name and mark and delivered, through counsel, cease-and-desist letters to A'lor, which have been ignored.

88.    A'lor has commingled its own mark with PCI marks to build brand or other recognition to the "Alor" mark and name.  There is no business or advertising justification to use any A'lor or "ALOR" mark with the PCI Trademarks.

89.    Unless A'lor is enjoined from so prominently and boldly displaying its name and mark alongside the CHARRIOL name, PCI will suffer a devaluation and dilution of its Trademarks and customer confusion will abound about the name behind the Products and A'lor products.

**A'lor's Passing-Off on Facebook**

90.     A'lor also combines the A'lor Logo in large size font on various advertising and social media, including Facebook, where A'lor inserts its name in prominent, bold letters as part of the overall CHARRIOL Facebook page, seizing upon the fame, goodwill, and reputation of CHARRIOL.  A true and correct copy of the CHARRIOL Facebook page arranged by A'lor is attached hereto as Ex. D.

91.     PCI has established its own official Facebook page, but A'lor's "CHARRIOL" Facebook page similarly combines A'lor's name and logo such that viewers and customers are confused as to the origin of the goods or name behind the Products: CHARRIOL or A'lor.

92.     A'lor also recently opened its own A'lor Facebook page in which it displayed CHARRIOL jewelry that was based upon designs approved by PCI, but used to display A'lor's Facebook page. A true and correct copy of the A'lor Facebook page is attached hereto as Ex. E.

93.     That is, A'lor launched its own Facebook page, which at the time of this pleading has over 4,000 "likes" (or followers), displaying CHARRIOL jewelry as Alor jewelry, but not depicting the jewelry as CHARRIOL, instead depicting the jewelry as Alor jewelry, trading upon the goodwill, name, and reputation of CHARRIOL for the benefit of A'lor and passing off the Products as Alor products.

94.     The CHARRIOL jewelry on the A'lor Facebook page is intended for trademark use only for PCI, not for A'lor; instead, A'lor again seizes upon the name, goodwill, fame, and reputation of CHARRIOL to launch its Facebook page and advertise the Alor brand and name at the expense of PCI, duping customers into believing that the products depicted on the A'lor Facebook page are Alor products.

95.     There is no authority under the License Agreement for A'lor to advertise its own marks or name with CHARRIOL Products.  To the contrary, A'lor's sole obligation under Jewelry Agreement Article 7.2 is to *"carry statements making clear that Licensee [A'lor] is the exclusive representative for the Products*

COMPLAINT; AND DEMAND
FOR JURY TRIAL

-17-

*in the Territory."* Such obligation does not include A'lor using its marks or symbols identifying A'lor as an independent brand or something other than PCI's licensee.

96.   A'lor uses and appends its own name in a means and way which has the intent and effect of drawing attention to A'lor and misrepresenting that A'lor is synonymous with CHARRIOL such that customers and the trade equate A'lor or "ALOR" with CHARRIOL, discerning no difference or no material difference in the products of A'lor.

97.   A'lor engages in such deception in order to pass-off its name and brand as linked to CHARRIOL such that A'lor holds out its goods as having an association or relationship to CHARRIOL other than A'lor acting as PCI's licensee under the Jewelry Agreement.

98.   Article 2.4 of the Jewelry Agreement prevents A'lor from mixing or co-mingling PCI Trademarks with any other marks, including A'lor's own mark.

99.   A'lor's use of its mark in advertising and Products displayed in such a manner causes and has caused, and will continue to cause, consumer, dealer, and/or trade confusion or deception.

100.   Article 2.4 of the Jewelry Agreement provides that A'lor cannot co-mingle or employ other commercial or business marks, including the "ALOR" mark, along with PCI's Trademarks.

101.   Article 2.5 of the Jewelry Agreement provides that PCI's Trademarks must be accompanied by words describing the Products, not other marks identifying A'lor.

102.   A'lor's Facebook page violates Jewelry Agreement Articles 2.1.b, 2.3, 2.4, 7.1, and 7.2, among other contract breaches.

103.   Unless A'lor is enjoined from using the Products as part of the A'lor Facebook page and as part of A'lor's website, PCI will suffer a devaluation and

dilution of its Trademarks and customer confusion will abound about the name behind the Products.

### A'lor Has No Exclusivity for "Cable & 18kt Gold Jewelry"

104.   A'lor's use of the phrase and words, "Cable & 18kt Gold Jewelry" is not simply descriptive of Products sold because there is no exclusivity under the Jewelry Agreement to use "Cable and 18kt Gold" in jewelry, which metals are being depicted as having exclusive use by A'lor by the way A'lor displays the subject mark.

105.   A'lor is an exclusive licensee under the Agreement, not a licensee with exclusive use of cable, gold, or steel.

106.   A'lor using "Cable & 18kt Gold Jewelry" under the phrase, "Exclusive Licensee of CHARRIOL" connotes that A'lor is an exclusive licensee of CHARRIOL "Cable & 18kt Gold Jewelry"; but A'lor enjoys no such exclusivity.

107.   A'lor is not an exclusive licensee of CHARRIOL "Cable & 18kt Gold Jewelry."

108.   Article 7.1 provides that A'lor is required to use the PCI Trademarks *"as directed"* by PCI, and that A'lor *"shall"* observe PCI's directions on the use of such Trademarks.

109.   A'lor does not have the unilateral or contractual discretion to elect whether to follow PCI's directions with regard to the use of PCI's Trademarks.

110.   PCI has not directed A'lor to use its name or the offending "Cable & 18kt Gold Jewelry" as part of any brand identity or advertising.

111.   PCI is authorized under the Jewelry Agreement to direct the use, size, colors, and all attributes of its Trademarks, including making the size larger and restricting what can be displayed as part of the PCI Trademarks, including the A'lor Logo and "Cable & 18kt Gold Jewelry."

112.   A'lor has no Jewelry Agreement right to display "Cable & 18kt Gold Jewelry."

COMPLAINT; AND DEMAND
FOR JURY TRIAL                                   -19-

113.   Jewelry Agreement Article 7.2 provides that any A'lor advertising requires PCI's exclusive written permission.  A'lor never inquired or asked, nor received permission to advertise "Cable & 18kt Gold Jewelry."

114.   Although Jewelry Agreement Article 7.2 requires A'lor to be identified as PCI's licensee in advertisements, such identification requires PCI's express approval.

115.   PCI's consent to use and/or display terms such as "Cable & 18kt Gold Jewelry" is required under the Jewelry Agreement.

116.   A'lor's use of "Cable & 18kt Gold Jewelry" as a descriptive phrase suggests such exclusivity.

117.   The display of "Cable & 18kt Gold Jewelry" or any A'lor mark alongside or in combination with PCI's marks causes dealer and consumer confusion, allowing A'lor to piggyback on the strength, goodwill, fame, and reputation of the PCI marks to build brand or other recognition to the "Alor" brand.

118.   Despite numerous warnings and PCI's cease-and-desist letters through counsel and directly, A'lor has never stated a business or advertising justification to use "Cable & 18kt Gold Jewelry" or any A'lor mark with or alongside the Trademarks.

119.   A'lor's actions are part of the groundwork for A'lor to compete with PCI and in violation of the Jewelry Agreement, using the placement of an A'lor or "ALOR" mark about and as part of the PCI Trademarks and CHARRIOL name as a means to build brand recognition and seize upon the goodwill, fame, and reputation of CHARRIOL and the Trademarks.

**A'lor's Outside Territory Activities**

120.   A'lor in late October 2012 participated in a JCK trade show in Panama in which A'lor displayed at its booth CHARRIOL and Alor jewelry.

121.   Panama is outside the Territory defined at Article 1.6 of the Jewelry Agreement.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                    -20-

122.   There is no authority under the Jewelry Agreement for A'lor to display CHARRIOL jewelry or the Products outside the Territory.

123.   To the contrary, the Territory is defined in Jewelry Agreement Article 1.6 as the United States and Canada.  Under Article 2.1.b, advertising, promotion, and marketing of CHARRIOL is limited to the Territory, and A'lor is prevented from undertaking any sales or marketing activity which harms the brand.

124.   Article 2.3 prevents A'lor from using the CHARRIOL name or brand as part of A'lor's trade name, and A'lor promoting CHARRIOL outside the Territory, including at the Panama trade show, is intended not to increase CHARRIOL brand awareness or customer loyalty, but to link A'lor and/or "ALOR" to CHARRIOL sufficient enough to confuse in the minds of buyers and the trade, as well as the public, the difference between A'lor and CHARRIOL with regard to cable-inspired jewelry.

125.   Indeed, A'lor intended at the Panama trade show, and at other times with other activities, to pass off A'lor's own brand of jewelry as that of CHARRIOL or sufficiently link the two brands so that the trade and consumers inextricably confuse the brands or consider them the same, allowing A'lor to build prestige to its own brand at the expense of CHARRIOL.

126.   Such conduct was intended by A'lor and allows A'lor or "ALOR" to obtain a free ride upon the strength, fame, and brand recognition of CHARRIOL.

127.   That is, A'lor is seizing upon the luxury brand CHARRIOL to increase brand prestige, awareness, and recognition of A'lor, which enjoys no such similar or heightened luxury distinction or reputation in the industry or in the minds of consumers.  And, A'lor is undertaking such infringing activity at the expense of, and getting a free ride off PCI.

128.   A'lor's promotion of CHARRIOL and display of CHARRIOL Products outside the Territory also violates Jewelry Agreement Article 2.4 because

COMPLAINT; AND DEMAND FOR JURY TRIAL

-21-

A'lor is co-mingling and employing PCI Trademarks and the CHARRIOL name and brand for A'lor's private commercial and business enterprise.

129.   In fact, A'lor participated in the Panama trade show in order to market its own brand to South American dealers and buyers, using the strength of the CHARRIOL brand to lure buyers to "ALOR," which then proceeded to pitch or promote its "ALOR" brand jewelry to such customers.

130.   That is, A'lor used CHARRIOL to attract dealers and buyers to "ALOR," and then pitched and promoted A'lor's cable-inspired products to such buyers, who ordinarily would have turned to CHARRIOL for such cable jewelry in their home districts.

131.   Given that A'lor's products, in violation of Jewelry Agreement Articles 3.1.b and 4.4, are not stylistically different or distinguished from CHARRIOL Products, the appearance of the A'lor name and marks alongside CHARRIOL gives the impression or, at a minimum, confuses the trade and consumers as to the origin of the Products and A'lor's products either when sold at the same stores, sold online, or displayed together outside the Territory.

132.   At the Panama trade show, A'lor represented to buyers that it was intending to launch or promote "ALOR" cable jewelry (that is not dissimilar from CHARRIOL) for sale outside the Territory, particularly in South American countries, under A'lor's own name.  A'lor thus is planning to engage in outside Territory sales of CHARRIOL-type (cable design) jewelry under A'lor's name or another A'lor-controlled brand, using CHARRIOL to build its standing and reputation.

133.   A'lor promoting or displaying CHARRIOL Products at the Panama trade show also violates Jewelry Agreement Article 7.2 because no permission from PCI was given to engage in such advertising, and nowhere did A'lor post or display a statement that it was the exclusive licensee of PCI in the Territory.

134.   Article 7.2.a also was offended because A'lor's promotion and display of CHARRIOL and the Products outside the Territory did not inspire customer loyalty or confidence to CHARRIOL because customers, buyers, and the trade were and will always be confused as to the relationship between A'lor and CHARRIOL, especially given the similar or same cable design that A'lor uses for its own products.

**A'lor's Website and Catalog Passes-Off CHARRIOL Products as Alor**

135.   A'lor recently created www.alor.com, which displays CHARRIOL Products even though the website is devoted to A'lor and benefits A'lor.  The A'lor website displays "ALOR" products (which actually are CHARRIOL Products) with a retail USD price exactly as the CHARRIOL jewelry appears on the www.charriolusa.com website operated by A'lor pursuant to the Jewelry Agreement, with the exact same retail prices.  Website visitors on www.charriolusa.com can shop by adding desired products to an on-line shopping bag, which cannot yet be done on the www.alor.com website.  Thus, the only difference is the missing 'shopping bag' option on www.alor.com.  A'lor clearly is preparing its website for on-line shopping capability because it displays pricing in U.S. dollars rather than foreign currency amounts, which would be a natural display if www.alor.com was intended merely as an on-line shopping vehicle for non-U.S. buyers.

136.   Under the Jewelry Agreement, A'lor is authorized to use various URLs with the name, "charriol" as part of the domain name, and A'lor has previously established www.charriolusa.com with PCI's consent.

137.   But A'lor's website and A'lor official catalog of products passes off the Products as Alor products, creating the distinct impression that the Products are "ALOR" products, not only in violation of the Jewelry Agreement, but also infringing upon PCI's Trademarks.

COMPLAINT; AND DEMAND
FOR JURY TRIAL

138.   Attached as Ex. F is a compilation of the products A'lor displays on its website and in A'lor's catalog and the corresponding CHARRIOL Products that are the same as the "ALOR" products.  That is, these "ALOR" products are being passed-off and misrepresented as being "ALOR" products when, in fact, they actually are CHARRIOL Products designed and produced by A'lor pursuant to the Jewelry Agreement.  These "ALOR" products are referred to herein as the "CHARRIOL Knock-off Jewelry."

139.   A'lor has no permission from PCI to display on its website the Products or PCI's Trademarks, but promotes the Products to build A'lor's own name and reputation.  The same Products are properly promoted and displayed on www.charriolusa.com, which is authorized under the Jewelry Agreement.

140.   A'lor displays the Products on its own website in order to pass-off the Products as A'lor's products and to strengthen the A'lor brand, reputation, and image, particularly given that the same general consumers shop for CHARRIOL and "ALOR" products.  There is no business justification or reason for A'lor to display the CHARRIOL Knock-off Jewelry on its website or in A'lor's catalog when they are not for sale on the A'lor website and A'lor already operates www.charriolusa.com to display and promote the Products.

141.   A'lor's launch of its website and use of its catalog displaying the Products is intended not to increase CHARRIOL brand awareness or customer loyalty, but to link A'lor and "ALOR" to CHARRIOL sufficiently to confuse in the minds of buyers, dealers, and the public the difference between A'lor and CHARRIOL and their respective products, especially with regard to cable-inspired jewelry.

142.   A'lor uses its website and distributes its catalog to build customer loyalty to "ALOR" by confusing customers into perceiving that cable jewelry or cable-inspired jewelry is an "ALOR" product or design, so that when A'lor markets

its own cable jewelry designs inside or outside the Territory, no distinction is drawn as to whether such jewelry originates or originated from CHARRIOL or A'lor.

143.   A'lor thus seizes upon the name, reputation, fame, and goodwill of CHARRIOL to develop its own brand, passing-off its products for the Products and building customer loyalty and confidence not to PCI as required under the Jewelry Agreement, but to A'lor.

144.   Further to A'lor's improper use of its catalog to promote CHARRIOL Knock-off Jewelry, A'lor displayed the catalog to existing and potential customers at the 2013 BaselWorld fair which took place in Basel, Switzerland from April 25 – May 2, 2013.

145.   BaselWorld is the world's largest exhibition and event for buyers, sellers, manufacturers, dealers, and customers for the display and ale of jewelry and watches.  Most of the world's ordering of jewelry and watches for the calendar year takes place at BaselWorld, by far, the world's most important trade and industry event.

146.   A'lor was not an exhibitor but appeared at Basel during the BaselWorld show 2013 and took hotel space, next to the fair, to meet with existing and potential dealers and customers, and to display its products for dealers to purchase and place orders for 2013-2014, until the 2014 BaselWorld.  A'lor did not even visit the CHARRIOL booth during BaselWorld.

147.   A'lor met with numerous buyers and dealers at BaselWorld between April 28 –May 2, 2013, displaying its goods, taking orders, and generally engaging in the marketing and sale of A'lor products.

148.   PCI has learned that A'lor displayed at BaselWorld CHARRIOL Knock-off Jewelry and used its catalog, which also displays CHARRIOL Knock-off Jewelry (Ex. F), to market, promote, and take orders for "ALOR" jewelry that is actually CHARRIOL Knock-off Jewelry.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                              -25-

149.   That is, A'lor entered Basel World for the express purpose of promoting "ALOR" jewelry and taking worldwide orders for A'lor jewelry, many of which collections, pieces, and lines are CHARRIOL Knock-off Jewelry.  The CHARRIOL Knock-off Jewelry infringes upon PCI's Trademarks, but is used by A'lor to solicit orders, build prestige in the "ALOR" line, and generally confuse dealers and customers as to the origin of CHARRIOL Products.  Indeed, dealers and customers naturally would query whether the CHARRIOL Knock-off Jewelry is of A'lor or CHARRIOL origin.

150.   A'lor used its catalog at BaselWorld to display "ALOR" goods, which actually are CHARRIOL Knock-off Jewelry, and to promote "ALOR" as a brand and to promote A'lor's collections, which infringe upon PCI's Trademarks and violate multiple sections of the Jewelry Agreement, including the Jewelry Agreement's implied covenant of good faith and fair dealing.

151.   A'lor exhibited during BaselWorld with the express purpose and intent of misrepresenting CHARRIOL Knock-off Jewelry as Alor jewelry, and with the express purpose and intent of displaying "ALOR" goods in A'lor's catalog which include CHARRIOL Knock-off Jewelry (Ex. F).

152.   During BaselWorld, the largest exhibition of its kind in the world, A'lor traded upon, made sales based upon, promoted and marketed, and otherwise engaged in commerce by misrepresenting to buyers and dealers (and to the public) that the promoted "ALOR" jewelry was designed by A'lor when, in fact, the jewelry lines and collections promoted by A'lor during BaselWorld included and were based upon the CHARRIOL Knock-off Jewelry.

153.   During BaselWorld, A'lor passed-off and held-out its collections as "ALOR" originals, when, in fact, the collections and displayed items were based upon and copies of the CHARRIOL Knock-off Jewelry, causing vast customer and dealer confusion, and public confusion as to the origin and legitimacy of CHARRIOL Products.

COMPLAINT; AND DEMAND
FOR JURY TRIAL

-26-

154.   If A'lor's display and promotion of the CHARRIOL Knock-off Jewelry is not enjoined, PCI will suffer (and already continues to suffer) vast and irreparable harm and damage to its name, brand, reputation, and domestic and international standing in the luxury goods community.

**A'lor's Inside Territory Sales of the Products Disguised as Alor Products**

155.   PCI has just discovered that at various places and times not known to PCI, A'lor has engaged in the advertising of putative A'lor products which are actually PCI Products disguised as A'lor products.  For instance, annexed as Ex. G are photographs from the CHARRIOLUSA Facebook site operated by A'lor for CHARRIOL and from A'lor's Facebook site which depict the same CHARRIOL jewelry which A'lor depicts online and elsewhere as ALOR products; this example and others  depict A'lor Jewelry that is actually CHARRIOL jewelry manufactured by A'lor under the Jewelry Agreement but re-branded as A'lor jewelry.

156.   A'lor has engaged in other instances of such advertising and promotion, misrepresenting CHARRIOL Products as Alor products.

**A'lor's Outside Territory Sales of the Products Disguised as Alor Products**

157.   PCI just discovered that A'lor has started selling re-branded CHARRIOL Products in Australia through Acacia Agencies ("Acacia"), an Australian-based jewelry wholesaler.

158.   A'lor is selling its own branded products through Acacia, including A'lor's house brand, DeLatori, which brand sales alone do not violate the Jewelry Agreement, but A'lor also is selling CHARRIOL branded Products, re-branded as "ALOR" jewelry.

159.   A'lor therefore is selling in Australia jewelry through at least 13 points of sale identified on A'lor's website that is actually CHARRIOL jewelry (the "Outside Territory CHARRIOL Knock-off Jewelry").  Such sales are very damaging to CHARRIOL's name, brand, and reputation.

160.   The identity of the known pieces of Outside Territory CHARRIOL Knock-off Jewelry are listed in Ex. H.

161.   For instance, A'lor is selling in Australia jewelry branded as Alor jewelry but which is actually CHARRIOL Bangle Ref. 04-32-S914-11 (Ex. H). The CHARRIOL clasp-lock has been changed to add "ALOR'S" name, but otherwise the "ALOR" bangle bracelet sold by A'lor in Australia is a knock-off of the CHARRIOL Bangle that A'lor designed for CHARRIOL under the Jewelry Agreement and which was approved by PCI and manufactured as a CHARRIOL bracelet for sale in the Territory.

162.   Each of these Outside Territory CHARRIOL Knock-off Jewelry items (Ex. H) are 18kt gold jewelry licensed under the Jewelry Agreement, and are composed of CHARRIOL designs approved by PCI to be manufactured and distributed by A'lor in the Territory.

163.   A'lor simply has taken the Products approved by PCI for distribution in the Territory, and manufactured them for sale and distribution in Australia under the "ALOR" name or another brand name, knocking-off PCI-approved designs.

164.   A'lor may be undertaking such sales in outside Territory countries other than Australia, including, upon information and belief, Kazakhstan, which are not known to PCI at the time of this pleading.

165.   A'lor never sought nor secured permission to sell the Outside Territory CHARRIOL Knock-off Jewelry in Australia or anywhere in the world.

166.   The sale of the Outside Territory CHARRIOL Knock-off Jewelry infringes PCI's Trademarks, infringes upon the CHARRIOL name, constitutes trademark dilution, constitutes improper passing off, and violates multiple provisions of the Jewelry Agreement as above-described, including Articles 2.1.b, 2.3, 2.4, 4.1, 4.4, 6.1, 7.1, and 7.2.

**A'lor's Outside Territory Sales via Social Network Marketing**

COMPLAINT; AND DEMAND FOR JURY TRIAL

-28-

167.   In or about November 28, 2011, A'lor, via the CHARRIOLUSA Twitter account maintained by A'lor, engaged in an exchange with a CHARRIOL customer residing in the Philippines inquiring about a CELTIC NOIR piece, with A'lor responding via its Twitter account that the customer should order the desired piece though a U.S. department store's online store.

168.   A'lor is restricted under the Jewelry Agreement from selling outside the Territory, and from causing or encouraging non-Territory buyers to purchase from dealers within the Territory.

169.   PCI has foreign distributors, and A'lor's causing sales from outside Territory buyers causes the dealer to infringe PCI trademarks and is in violation of Jewelry Agreement Articles 2.1, 2.1.a, 2.1.b, 2.3, 2.4, and 6.1.

170.   PCI's marketing to outside Territory customers draws sales from PCI's outside Territory distributors and partners, and violates Article 6.1 of the Jewelry Agreement.

171.   Jewelry Agreement Article 2.3 restricts use of PCI marks to the Territory; A'lor promoting U.S. retailers to sell licensed products into another Territory violates A'lor's duties to the Territory in the Jewelry Agreement and also violates Article 7.1, which provides that PCI may direct the way in which its marks are used.

**A'lor Tests the U.S. Market with Infringing Sales**

172.   In or about May 2012, A'lor began advertising and selling CHARRIOL cufflinks which include on the sides of the cable-inspired cufflinks the "ALOR" logo and symbol:

, Ex. I.

173.   A'lor did not secure permission from PCI to manufacture, distribute, or sell these CHARRIOL cufflinks, nor did A'lor submit a design for such cufflinks that included an A'lor logo.

174.   PCI was never asked, nor did PCI ever review an A'lor design for CHARRIOL cufflinks that included the familiar A'lor logo as part of the design.

175.   A'lor never submitted a design to PCI, nor did A'lor secure approval from PCI to manufacture or sell cufflinks with an A'lor logo.

176.   A'lor violated and continues to violate Jewelry Agreement Article 2.1.b by distributing and selling CHARRIOL cufflinks with the A'lor logo because such cufflinks do not promote the goodwill or build and preserve the reputation of CHARRIOL or the CHARRIOL brand, but instead promotes the goodwill and reputation of A'lor and "ALOR."

177.   A'lor violated and continues to violate Jewelry Agreement Article 2.1.b because the manufacture, sale, and distribution of the cufflinks with the A'lor logo is inapposite to A'lor acting as an ambassador of the CHARRIOL name and brand, and such sales and advertising of the cufflinks harms and has the potential to further harm the CHARRIOL name and brand, including reputation and standing because customers are confused as to the origin of the cufflinks: whether they are "ALOR" or CHARRIOL cufflinks.

178.   Indeed, given that the cufflinks contain the familiar name and symbol of both A'lor and CHARRIOL, customers are confused as to whether the cufflinks are co-branded or are among the family of the Products or from the "ALOR" family of goods given the placement of the A'lor logo.

179.   A'lor's placement of the A'lor logo on the cufflinks is intended by A'lor to gain a free ride on the goodwill, fame, reputation, and name PCI has built-up in the CHARRIOL brand.

180.   At the time it improperly and without permission appended the A'lor logo to the CHARRIOL cufflinks, A'lor intended to begin to merge in the eyes of

COMPLAINT; AND DEMAND
FOR JURY TRIAL                               -30-

1   consumers the CHARRIOL name, reputation, and brand with A'lor because A'lor

2   intends to withdraw from or terminate, or cause the termination of the Jewelry

3   Agreement and begin to sell "ALOR" products which are similar to CHARRIOL

4   Products in the Territory, including the important U.S. market.

5          181.   A'lor is engaging in a systematic effort to blend in the eyes and minds

6   of consumers the CHARRIOL name and reputation along with the "ALOR" name

7   and brand such that when A'lor focuses in the Territory sales of A'lor cable jewelry

8   that is in all meaningful ways the same as CHARRIOL cable jewelry, there will be

9   considerable customer confusion as to the origin of such goods.

10          182.   In appending the A'lor logo to the cufflinks, A'lor has willfully and in

11   bad faith caused irreparable harm to PCI; infringed PCI's Trademarks; committed

12   unfair competition; and unfairly profited from such activity at PCI's expense.

13          183.   Unless enjoined, A'lor will continue to sell CHARRIOL cufflinks

14   bearing the A'lor or an "ALOR" logo and begin to expand the A'lor jewelry

15   offerings bearing the A'lor logo or other imprimatur of A'lor.

16          **A'lor's Various Jewelry Agreement Breaches**

17          184.   The relationship between A'lor and PCI has been deteriorating for

18   years, caused particularly by A'lor's plan to design, develop, and implement a

19   competing line of jewelry in the Territory and outside the Territory.

20          185.   The fractured relationship had its origin in 2010, when PCI terminated

21   the parties' first license agreement, such termination effective March 3, 2010.

22          186.   A'lor responded by suing PCI in the United States District Court for

23   the Southern District of California, Docket No. 3:10-cv-0757 (MMA) (JMA).  That

24   lawsuit was settled confidentially before it was contested by PCI and before

25   counterclaims were asserted, with A'lor agreeing to pay PCI overdue royalty

26   payments, and the parties entering into the Jewelry Agreement; a revised agreement

27   pertaining to watches known as the October 1, 2010 Exclusive Watch Sales

28

COMPLAINT; AND DEMAND
FOR JURY TRIAL                          -31-

Representation Agreement (the "Watch Agreement") which has since been terminated by PCI; and other agreements favorable to PCI.

187.   A few months after the settlement, the parties' relationship was tested by A'lor's mischief with regard to improperly discounted or late paid royalties and A'lor's general failure to competently develop the CHARRIOL brand in the Territory at the expense of A'lor developing its own Alor brand.

188.   A'lor became so preoccupied with developing its own brand at the expense of PCI (and engaged in increasing misuse of markdowns and allowances to decrease royalties owed to PCI), that turnover sales, for instance, made by A'lor for PCI in 2011 before deduction of markdowns and allowances reached $13,508,916, but decreased in 2012 to $9,469,639, most of which decrease is attributed to A'lor's focus on "ALOR" jewelry rather than CHARRIOL jewelry and A'lor's obligations under the Jewelry Agreement.

189.   Indeed, A'lor has lately spent more time and effort developing and marketing its own brand products rather than devoting sufficient resources to developing CHARRIOL and making CHARRIOL sales.

**The Royalties Breach**

190.   Almost since the commencement of the Jewelry Agreement, A'lor has unilaterally avoided or intentionally under-paid royalties to PCI by falsely and improperly attributing deductions to royalty payments that are owed to PCI.

191.   For instance, under Article 8.1 of the Jewelry Agreement, A'lor has consistently applied certain adjustments to the Net Sales turnover, reducing the royalties due to A'lor-invented "Markdowns" and "Co-Op Allowances," among other reasons.   The Jewelry Agreement does not authorize A'lor to reduce the Article 8.1 royalties with co-op advertising expenses.

192.   "Net Sales" are defined in Article 1.3 of the Jewelry Agreement as all *"gross sales . . . less discounts, markdowns, and allowances."*

---

COMPLAINT; AND DEMAND
FOR JURY TRIAL                      -32-

193.   *"Markdowns and allowances"* are not specifically defined in the Jewelry Agreement, but that has not stopped A'lor since October 1, 2010 from attributing $3,349,244 in "Total Markdowns and Allowances," and $360,779 in total trade discounts, deductions which represent 11.23% of the turnover for the period, which are not authorized under the Jewelry Agreement and were never previously claimed by A'lor or attributed to "Net Sales" during the period 1992-2010.  A'lor thus underpaid royalties by the amount of $296,800

194.   Along with statements concerning royalty payments, A'lor typically submits to PCI a "Detail Listing" report that includes in the "Markdown" category certain co-op advertising that is required under the Jewelry Agreement, and therefore not subject to being considered a "Markdown" or "Allowance."

195.   For instance, under Jewelry Agreement Article 7.2.a, A'lor is obligated to *"advertise, market, and promote the Products,"* spending, under Article 7.3, not less than three-percent (3%) *"of Net Sales for such advertising, including co-op advertising and promotion of the Products each year."*

196.   Since A'lor is contractually obligated to engage (that is, spend) in such minimum promotion of the Products, including co-op advertising, A'lor has no contractual basis to deduct co-op advertising expenses from the royalties due under Article 8.1 even if such spending is satisfied by merchandise credits, as A'lor has previously claimed.

197.   Under Jewelry Agreement Article 8.1, A'lor is obligated to remit eight percent (8%) of paid "Net Sales" to PCI less two percent (2%) which is applied to PCI's contribution to advertising and promotion expenditures.  Royalty payments under Article 8.1 are subject to the 2% set-off for PCI's contribution to A'lor's advertising for the Products, but are not subject to an additional offset for co-op advertising that A'lor unilaterally takes.

198.   Deducting co-op advertising in addition to the 2% offset under Article 8.1 results in a double-dip offset for advertising, reducing the Article 8.1 royalty payments by a greater factor than contemplated by the Jewelry Agreement.

199.   In addition, the few "Markdowns and Allowances" statements submitted by A'lor with its royalty payments deems all such allowances as "Credit Memos," indicating that these reductions are attributed to credits back to the dealer.

200.   To this date, PCI does not know the extent to which A'lor has engaged in improperly reducing "Net Sales" through "Markdowns and Allowances" because after A'lor submitted such statements in the third and fourth quarters 2010 and the first quarter 2011, A'lor stopped submitting such reports after PCI's protests, claiming that PCI should instead audit A'lor at its San Diego facility to learn the extent to which A'lor continued to engage in such improper royalty treatment.

201.   Credit memos in the retail jewelry industry indicate credit for returned product, pricing corrections, achievement of sales goals, price reductions, and other commercial reasons when a seller offers a credit to a dealer; these commonly include "markdowns and allowances."

202.   A'lor has characterized co-op allowances under Jewelry Agreement Article 1.3.d as a "promotion," seeking to justify the deduction from A'lor's Article 8.1 royalties' reports.

203.   A'lor therefore improperly treats co-op advertising in the form of merchandise credit, a means of advertising contribution to the dealer which has the effect of artificially reducing "Net Sales."

204.   There is no contractual basis for A'lor to reward dealers with merchandise credit to offset A'lor's co-op advertising obligations under Jewelry Agreement Articles 2.1.b and 7.3.

205.   A'lor is not authorized under the Jewelry Agreement to honor its co-op advertising obligations by simply gifting or reducing the cost of merchandise to its accounts so that A'lor reduces its royalty obligations to PCI.  To the contrary,

COMPLAINT; AND DEMAND
FOR JURY TRIAL

-34-

Article 7.3 requires A'lor to *"spend"* not less than three-percent (3%) of *"Net Sales"* for co-op advertising, not credit its dealers as a means to honor such 'spending' obligation.

206.   Since October 2010, PCI estimates that the amount of royalties that A'lor has improperly failed to remit to PCI because of these improper deductions is not less than $296,800 (calculated on the basis of 8% of the total markdowns and allowances and trade discounts deducted by A'lor from its sales turnover).

### A'lor's Non-Approved Designs

207.   On or about December 21, 2011, PCI discovered through an Internet search that A'lor was advertising a CHARRIOL 'Emerald and Diamond Couture Ring' without the required Jewelry Agreement permission from PCI.  The exact date A'lor began the advertising campaign is not known to PCI.

208.   A'lor requires authorization from PCI under Jewelry Agreement Articles 7.1 and 7.2 to advertise and use the Trademarks, and no such authorization was furnished by PCI or even requested by A'lor.

209.   The 'Emerald and Diamond Couture Ring' was not approved by PCI as required under Article 4 of the Jewelry Agreement.

210.   A'lor's designing and then promoting unapproved Products with unapproved advertising schemes violates the Jewelry Agreement.

### A'lor's Non-Approved Advertising

211.   In or about June 2011, A'lor began employing an advertising tag line, "Where to Wear," which presently appears on A'lor's website, without securing permission from PCI to use the phrase or mark in connection with CHARRIOL goods and the Products.  A'lor failed to respond to PCI inquiries about whether A'lor secured the mark-holder's (Z Luxe Group Inc., a La Jolla, California company; Jill Fairchild) permission to use the phrase.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                                 -35-

212.   A'lor's careless use of the tag line runs the risk of trademark infringement that bears upon the goodwill of the CHARRIOL name and reputation, since the CHARRIOL name is connected to such mark.

**FIRST CAUSE OF ACTION**
**(Trademark Counterfeiting Under §§ 32, 34, 35 of the Lanham Act)**
**(15 U.S.C. §§ 1114(1), 1116(d), 1117(b)-(c))**

213.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 212 as if set forth in full.

214.   Without PCI's consent or authorization, and having knowledge of PCI's well-known and prior right to the PCI Trademarks, A'lor has distributed, caused the marketing and advertising, offered for sale through an agent, and/or sold counterfeit products in direct competition with PCI.

215.   The CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Jewelry, displayed, presented, marketed, promoted, and/or sold in A'lor's catalog, on A'lor's website, on A'lor's Facebook page, at trade shows and exhibitions, and elsewhere, reproduces, counterfeits, copies, and colorably imitates the Products and PCI's Trademarks.

216.   The CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Jewelry displayed, presented, marketed, promoted, and/or sold in A'lor's catalog, on A'lor's website, on A'lor's Facebook page, at trade shows and exhibitions, and elsewhere, displays spurious designations that are identical with or indistinguishable from the Products and PCI's Trademarks under the Jewelry Agreement and as are registered in the United States.

217.   A'lor has used and applied its reproductions, counterfeits, copies, and colorable imitations of the CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Knock-off Jewelry in order to pass-off and represent to dealers, buyers, and the public that the CHARRIOL Knock-off Jewelry and the

COMPLAINT; AND DEMAND
FOR JURY TRIAL

1    Outside Territory CHARRIOL Knock-off Jewelry are actually A'lor designs and

2    products.

3         218.   A'lor intends and intended the CHARRIOL Knock-off Jewelry and the

4    Outside Territory CHARRIOL Knock-off Jewelry to be used in commerce or in

5    connection with the sale, distribution, or advertising of A'lor's goods, which is

6    likely to cause confusion, cause mistake, or deceive the trade, consumers, and

7    dealers.

8         219.   A'lor's unauthorized use outside the Territory of the Trademarks and

9    sale of the CHARRIOL Knock-off Jewelry and Outside Territory CHARRIOL

10   Knock-off Jewelry was done with notice and full knowledge by A'lor that such use

11   was not authorized or licensed by PCI.  And is barred under the Jewelry Agreement

12        220.   A'lor's actions constitute willful counterfeiting of PCI's Trademarks

13   in violation of 15 U.S.C. §§ 1114, 1116(d), and 1117(b)-(c).  A'lor has copied the

14   Products, used the PCI Trademarks, and engaged in the production of copies and

15   counterfeit Products in order to market and promote Alor goods and A'lor's name,

16   reputation, and goodwill.

17        221.   As a direct and proximate result of A'lor's conduct, PCI has suffered

18   damage to its valuable Trademarks, name, reputation, brand, and prestigious

19   standing and PCI seeks an award of A'lor's profits and an order that PCI recover

20   A'lor's illicit profits and damages arising out of the unlawful acts of deception and

21   infringement, and a sum equal to three times such profits or damages (whichever is

22   greater), pursuant to 15 U.S.C. § 1117(b), but in an amount not less than $10

23   million, and for an award of $2 million per counterfeit trademark per type of goods

24   sold, offered for sale, or distributed pursuant to 15 U.S.C. § 1117(c)(2), plus the

25   attorneys' fees, interest, costs, and expenses of this action.

26        222.   PCI does not have an adequate remedy at law, and will continue to be

27   harmed and damaged by A'lor's marketing, promotion, advertising, and sale of

28

COMPLAINT; AND DEMAND
FOR JURY TRIAL                          -37-

counterfeit products and the described trademark infringement unless this Court enjoins A'lor from such fraudulent business practices.

## SECOND CAUSE OF ACTION
### (Infringement of Registered Trademarks)
### (15 U.S.C. § 1114 / Lanham Act § 32)

223.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 222 as if set forth in full.

224.   PCI has continuously used its Trademarks in interstate commerce since January 8, 1985.

225.   PCI, as the owner of all right, title, and interest in and to the Trademarks, has standing to maintain an action for trademark infringement under the Trademark Statute 15 U.S.C. § 1114.

226.   A'lor, at all times relevant, was aware that PCI owned the Trademarks and was the registered owner of the Trademarks.

227.   A'lor failed to obtain the consent and authorization of PCI as the registered owner of the Trademarks to deal in and commercially distribute, promote, market, and sell the CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Knock-off Jewelry and related products and things bearing the Trademarks in the stream of commerce.

228.   A'lor intentionally and knowingly infringed upon the Trademarks by (i) improperly and in violation of the Jewelry Agreement advertising A'lor as depicted in this Complaint in print, social network, on-line, and other ways by inserting and arranging the A'lor logo and the "ALOR" name and logo in a bold, large, heightened, and aggressive manner such that A'lor's name and logo appears together and synonymous with the CHARRIOL name, causing actual and possible confusion among those who view such advertisements and depictions; (ii) displaying, showing, exhibiting, and presenting the Trademarks (including the

---

Products) and the CHARRIOL name and brand alongside and with A'lor's name and the "ALOR" logo at trade shows, in advertising, and other events; (iii) selling "ALOR" products outside the Territory that infringe the Trademarks; (iv) selling cufflinks which include the A'lor logo as part of the CHARRIOL name and logo; (v) establishing the A'lor Facebook page which displays the Products and PCI's Trademarks; (vi) establishing the A'lor website which displays the Products and PCI's Trademarks; and (vii) generally engaging in the manufacture, promotion, marketing, presentation, and sale of the CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Knock-off Jewelry.

229.   A'lor intentionally and knowingly engaged in these infringing activities, as more detailed in this Complaint, in connection with the sale, offering for sale, distribution, or advertising of PCI's goods by offering, advertising, promoting, retailing, selling, and distributing CHARRIOL Products outside the Territory under the "ALOR" name and by selling, offering for sale, distributing, promoting, displaying, presenting, or advertising A'lor infringing products inside and outside the Territory; by using the Trademarks to market and promote A'lor and its products; and by appending the "ALOR" name and logo to products and media utilizing the CHARRIOL name and logo in order to seize upon the strength of the CHARRIOL name to build the Alor name and logo.

230.   A'lor reproduced, copied, imitated, employed, displayed, showed, presented, used, and relied upon PCI's Trademarks and used such in advertisements, sales, distribution, marketing, and promotion of A'lor's products or the Alor name and brand in commerce and in connection with the sale, offering for sale, distribution, and advertising of goods and services.  A'lor thereupon offered, advertised, promoted, retailed, sold, and distributed goods bearing or infringing upon PCI's Trademarks.

231.   A'lor's egregious and intentional use of PCI's Trademarks to build and gain prestige for A'lor's own name and brand, and A'lor's sale of goods bearing

PCI's Trademarks (nautical rope design) has caused actual confusion and is likely to continue to cause further confusion, or to cause mistake, or to deceive, mislead, betray, and defraud consumers and dealers who believe that the goods they are purchasing are authentic CHARRIOL items or are authorized by CHARRIOL or are approved by CHARRIOL.

232.   A'lor's acts have been committed with knowledge of PCI's exclusive rights and goodwill in the Trademarks, as well as with bad faith and the intent to cause confusion or to cause mistake and to deceive.

233.   PCI has suffered and will continue to suffer substantial irreparable injury, loss, and damage to its rights in and to the Trademarks and goodwill associated therewith, for which it has no adequate remedy at law; PCI therefore, is entitled to injunctive relief.

234.   A'lor's continued and knowing use of PCI's Trademarks without PCI's consent or authorization constitutes intentional infringement of PCI's federally registered trademarks in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114.  Based upon such conduct, PCI is entitled to injunctive relief as well as monetary damages in an amount not less than $10 million, and other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, including profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

## THIRD CAUSE OF ACTION
**(False Designation of Origin, Passing Off & Unfair Competition)**
**(15 U.S.C. § 1125(a) / Lanham Act § 43(a))**

235.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 234 as if set forth in full.

236.   PCI has standing to maintain an action for false designation of origin and unfair competition under the Federal Trademark Statute, Lanham Act § 43(a), 15 U.S.C. § 1125.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                                  -40-

237.   A'lor has, without authorization, on or in connection with its goods and services, made false designations of origin which are likely to cause confusion or cause mistake or to deceive as to affiliation, connection, or association of PCI's Products and/or as to the origin, sponsorship, or approval of PCI's goods or commercial activities.

238.   A'lor's conduct as above described violates the Lanham Act, and A'lor has unfairly competed with and injured, and unless immediately restrained, will continue to injure PCI, causing damage to PCI in an amount to be determined at trial, and will cause irreparable injury to PCI's name, brand, goodwill, and reputation.

239.   The conduct of A'lor has been knowing, deliberate, willful, intended to cause confusion intended to cause mistake, and intended to deceive and in blatant disregard of PCI's rights under the Jewelry Agreement and PCI's federally protected intellectual property rights.

240.   A'lor knew or by the exercise of reasonable care should have known that its adoption and commencement of use in commerce and continuing use of A'lor or "ALOR" products which infringe upon PCI's Trademarks and that are confusingly similar to and constitute a reproduction of the Products would and do cause confusion, mistake, or deception among purchasers and dealers, users, and the public.

241.   A'lor's intentional use and sale of products that are confusingly similar to and constitute a reproduction or infringement of PCI's Trademarks and the Products, and which adopt the A'lor logo unfairly compete with PCI and are likely to cause confusion, mistake, or to deceive, mislead, betray, and defraud consumers and dealers to believe that the Alor products are genuine CHARRIOL Products or are endorsed or approved by CHARRIOL.

242.   A'lor's conduct including false designation of origin (passing-off) and unfair competition in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a) has

caused PCI to suffer substantial and irreparable injury for which it has no adequate remedy at law.

243.   A'lor's conduct has permitted or will permit A'lor to make substantial sales and profits on the strength of PCI's Trademarks and the strength of PCI's marketing, advertising, sales, and consumer and trade recognition.

244.   As a direct and proximate cause of A'lor's conduct, as alleged herein, PCI has been and will be deprived of sales of its Products in an amount not less than $10 million but to be evidenced at trial, and has been deprived and will be deprived of the value of its Trademarks as commercial assets in an amount as yet unknown but to be determined at trial.

245.   Based upon such conduct, PCI is entitled to injunctive relief as well as monetary damages, and other remedies provided by 15 U.S.C. § 1125(a), including profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

246.   PCI seeks an accounting of A'lor's profits and requests that the Court grant PCI treble damages, attorneys' fees, and costs.

### FOURTH CAUSE OF ACTION
**(Trademark Dilution)**
**(15 U.S.C. § 1125(c) / Lanham Act § 43)**

247.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 246 as if set forth in full.

248.   PCI's Trademarks are famous marks pursuant to 15 U.S.C. § 1125(c) and became famous prior to the filing of this Complaint and prior to the commencement of the activities attributed to A'lor in this Complaint.

249.   A'lor's activities as alleged in the Complaint dilute, both by blurring and tarnishment, the distinctive quality of PCI's Trademarks in violation of 15 U.S.C. § 1125(c).  A'lor's activities were willful pursuant to 15 U.S.C. § 1125(c)(5)(B).

250.   Based upon such conduct, PCI is entitled to A'lor's profits, PCI's damages in an amount not less than $10 million, treble damages pursuant to 15 U.S.C. §1117(a)(3), and costs and reasonable attorneys' fees.

251.   A'lor's infringing activities as described in the Complaint have caused irreparable injury and harm and other damages to PCI and its business, reputation, and goodwill in its federally registered Trademarks.

252.   Unless enjoined by the Court, A'lor's infringing activities will continue to dilute PCI's Trademarks and cause PCI irreparable injury and other damage to PCI and its business, name, and reputation and goodwill and in its Trademarks.

### FIFTH CAUSE OF ACTION
**(Unfair Competition)**
**(California Common Law)**

253.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 252 as if set forth in full.

254.   By marketing, advertising, promoting, and selling in violation of PCI's Trademark rights and infringing the Trademarks and/or otherwise dealing in the infringing activities, A'lor has engaged in unfair competition including unlawful, unfair, and fraudulent business practices in violation of California common law.

255.   A'lor's marketing, advertising, promoting, and selling infringing products and infringing the Trademarks is in violation and derogation of PCI's rights and is likely to cause confusion, mistake, and deception among consumers and the public as to the source, origin, sponsorship, or quality of the goods of A'lor and the goods of PCI, thereby causing loss, damage, and injury to PCI and the purchasing public.

256.   A'lor's conduct was intended to cause such loss, damage, and injury.

257.   A'lor knew or by the exercise of reasonable care should have known that its marketing, advertising, promoting, selling, and dealing in and its continuing

COMPLAINT; AND DEMAND
FOR JURY TRIAL                          -43-

marketing, advertising, promoting, selling and dealing in the infringing products and infringing the Trademarks would cause confusion, mistake, and deception among purchasers, users, and the public.

258.   By marketing, advertising, promoting, selling, and dealing in the infringing goods and by infringing the Trademarks, including the production, marketing, promoting, and sale of the CHARRIOL Knock-off Jewelry and the Outside Territory CHARRIOL Knock-off Jewelry, and the continuing marketing, advertising, promoting, selling, and dealing in infringing products, A'lor intended to and induced and intends to and will induce customers to purchase A'lor's products by trading off the extensive goodwill developed by PCI.

259.   The conduct of A'lor has been knowing, deliberate, willful, intended to deceive and cause confusion, or to cause mistake, and is in disregard of PCI's rights.

260.   A'lor's wrongful conduct as alleged in this Complaint has permitted or will permit A'lor to make substantial sales and profits on the strength of PCI's Trademarks and the strength of PCI's worldwide marketing, advertising, sales, and consumer and trade recognition.  Such conduct further damages the CHARRIOL name and brand by creating confusion in the consumer and trade marketplace as to the origin of such jewelry products and contributes to A'lor building a brand on the strength of the CHARRIOL name and image.

261.   As a direct and proximate cause of A'lor's conduct, as alleged herein, PCI has been and will be deprived of sales of its Products in an amount not less than $10 million but to be evidenced at trial, and has been deprived and will be deprived of the value of its Trademarks as commercial assets in an amount as yet unknown but to be determined at trial.

262.   PCI seeks an order granting A'lor's profits stemming from its infringing activities and its actual and/or compensatory damages.

COMPLAINT; AND DEMAND
FOR JURY TRIAL                    -44-

263.   PCI has no adequate remedy at law for A'lor's continuing violation of its rights as set forth above.  PCI therefore seeks preliminary and permanent injunctive relief.

264.   PCI seeks exemplary or punitive damages for A'lor's intentional misconduct.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)
### (California Common Law)

265.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 264 as if set forth in full.

266.   Due to the unlawful acts of A'lor as described in this Complaint, A'lor has been unjustly enriched in an amount to be evidenced at trial but exceeding $10 million.

267.   A'lor's retention of monies gained through its deceptive business practices, infringement, acts of deceit, and otherwise would serve to unjustly enrich A'lor and would be contrary to the interests of justice.

268.   A'lor has received a benefit that it otherwise was not entitled to under the jewelry Agreement, under common law, pursuant to any business arrangement with PCI, but at PCI's expense, and has enjoyed such financial benefit at the expense of PCI in an amount not less than $10 million.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract)
### (California Common Law)

269.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 268 as if set forth in full.

270.   A'lor has breached the Jewelry Agreement in numerous ways as detailed in this Complaint.  Pursuant to each such breach, A'lor had a duty to

perform, that is, an affirmative obligation to perform the activities described; A'lor breached such duty; and PCI has suffered damages.

271.   For instance, A'lor has breached the Jewelry Agreement by under-paying royalties to PCI by falsely and improperly attributing deductions to royalty payments that are owed to PCI.

272.   A'lor has breached Article 8.1 of the Jewelry Agreement by improperly applying certain adjustments to the Net Sales turnover, reducing royalties owed to PCI due to alleged "Markdowns" and "Co-Op Allowances," among other reasons.  The Jewelry Agreement does not authorize A'lor to reduce the Article 8.1 royalties with co-op advertising expenses.

273.    Under Jewelry Agreement Article 8.1, A'lor is obligated to remit eight percent (8%) of paid "Net Sales" to PCI less two percent (2%) which is applied to PCI's contribution to advertising and promotion expenditures.  A'lor has failed to remit such proper amount to PCI.

274.   Royalty payments under Article 8.1 are subject to the 2% set-off for PCI's contribution to A'lor's advertising for the Products, but are not subject to an additional offset for co-op advertising that A'lor unilaterally takes.

275.   PCI has been damaged in an amount to be determined at trial but not less than $296,800 due to unpaid royalties.

276.   A'lor further breached the Jewelry Agreement by advertising the CHARRIOL 'Emerald and Diamond Couture Ring' without the required Jewelry Agreement permission from PCI.

277.   The 'Emerald and Diamond Couture Ring' was not approved by PCI as required under Article 4 of the Jewelry Agreement, and PCI disapproves of the sale of this jewelry item.

278.   In addition, A'lor has advertised cable bracelets referred to as "*Celtique Noire™*" but PCI owns the trademarks "CELTIC" (No. 1856696

registered on October 4, 1994) and "CELTICA" (No. 3537333 registered on November 25, 2008).

279.   A'lor as part of its advertising uses "ALOR™," to create confusion, a violation of the Jewelry Agreement.

280.   A'lor has engaged in other Jewelry Agreement breaches as detailed in the Complaint, including:

•        Displaying the A'lor logo and name in bold, prominent, and aggressive fashion violating Jewelry Agreement Articles 2.1.b, 2.3, 2.4, 7.1, and 7.2 (Complaint ¶¶ 72, 81, 83, 84, 90, 111, 173, 177, 228, 241);

•        Using the PCI Trademarks for A'lor's Facebook page violating Jewelry Agreement Articles 2.1.b, 2.3, 2.4, 7.1, and 7.2 (Complaint ¶¶ 90-94, 102, 103, 215, 216, 228);

•        Displaying "Cable & 18kt Gold Jewelry" in bold, prominent, and aggressive fashion violating Jewelry Agreement Articles 7.1 and 7.2 (Complaint ¶¶ 72, 73, 104-119);

•        Displaying the PCI Trademarks and Products at the JCK Panama trade show violating Jewelry Agreement Articles 2.1.b, 2.3, 2.4, 7.2, and 7.2.a (Complaint ¶¶ 120-134);

•        Using the PCI Trademarks for A'lor's website violating Jewelry Agreement Articles 2.1.b, 2.3, 2.4, 4.4 7.1, and 7.2 (Complaint ¶¶ 24, 135-143, 211, 215, 216, 228);

•        Engaging in extra-Territory sales of the Products and selling the Outside Territory CHARRIOL Knock-off Jewelry violating Jewelry Agreement Articles 2.1.a, 2.1.b, 2.2, 2.3, 2.4, 2.5, 3.1.b, 4.1, 4.3, 7.1, 7.2, 7.2.a, 9.1, and 9.6 (Complaint ¶¶ 120-134, 157-171, 215, 216, 218, 219, 228, 258);

•        Engaging in improper and unauthorized cufflink sales with the A'lor logo violating Jewelry Agreement Articles 1.5, 2.1.b, 2.2, 2.4, 4.1, and 7.1 (Complaint ¶¶ 172-183, 228);

COMPLAINT; AND DEMAND
FOR JURY TRIAL

-47-

• Engaging in the CHARRIOL Knock-off Jewelry sales violating Jewelry Agreement Articles 2.1.a, 2.1.b, 2.2, 2.3, 2.4, 2.5, 3.1.b, 4.1, 4.3, 7.1, 7.2, 7.2.a, 9.1, and 9.6 (Complaint ¶¶ 138, 140, 144, 148-154, 215-319, 227, 228, 258);

281.   All of these contract breaches, and the other Jewelry Agreement breaches detailed in this Complaint, have damaged PCI in an amount to be determined at trial, but not less than $10 million due to the harm PCI has suffered by A'lor ignoring nearly every aspect of the Jewelry Agreement, and A'lor engaging in improper Alor sales in violation of the Jewelry Agreement.

## EIGHTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (California Law)

282.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 281 as if set forth in full.

283.   Implied by California law in the contract between PCI and A'lor, the Jewelry Agreement, is a covenant of good faith and fair dealing.

284.   A'lor deprived PCI of the benefit of the bargain between the parties by failing to honor the Jewelry Agreement, specifically by not complying with the spirit and understanding of the contract by engaging in authorized sales, appending A'lor's name and logo to PCI advertising, by falsely deducting expenses from royalty payments, by engaging in A'lor sales practices that seize upon the name and goodwill of PCI, by using the CHARRIOL name and goodwill to promote A'lor's business and sale and products, and by the other conduct described in this Complaint.

285.   Even if A'lor did not breach the Jewelry Agreement in a technical sense, A'lor's conduct as described in the Complaint deprived PCI of its benefit of the bargain of this contract.

286.   A'lor's conduct in breaching the implied covenant of good faith and fair dealing is different than the conduct resulting in A'lor's breach of the Jewelry Agreement in that, absent such breaches by A'lor, PCI would have enjoyed greater sales of the Products and a greater expansion of the CHARRIOL name, brand, and public name and recognition had A'lor simply honored its contractual obligations.

287.   A'lor has undermined PCI's business by creating customer and trade confusion.

288.   PCI has not enjoyed the benefit of its bargained for exchange under the Jewelry Agreement, and A'lor has acted in bad faith by undertaking the very public presentation of A'lor and its products that trade upon the strength of the CHARRIOL name and brand.

289.   In bad faith, A'lor has taken steps to sabotage the success of CHARRIOL and to make it appear that A'lor is associated with CHARRIOL to the extent that the public distinction between the companies is becoming undistinguishable.

290.   Due to the breach of the Jewelry Agreement's implied covenant of good faith and fair dealing, PCI has incurred not less than $10 million in damages, the actual amount to be adduced through discovery and at trial as facts unknown to PCI are revealed about A'lor's conduct.

## NINTH CAUSE OF ACTION
### (Accounting)

291.   PCI repleads, realleges, and incorporates herein by reference the allegations in paragraphs 1 through 290 as if set forth in full.

292.   PCI is entitled under California law and pursuant to Article 8.4 of the Jewelry Agreement to an accounting, and such accounting shall be ordered by the Court without the need for any professional to be accompanied by PCI during such accounting.

COMPLAINT; AND DEMAND FOR JURY TRIAL                    -49-

293.   A'lor is required under the Jewelry Agreement and under California law to provide the accounting on its own and at A'lor's cost.

294.   PCI is entitled to a full and complete accounting for PCI and CHARRIOL related sales the years 2010 – 2012 and the quarters that have passed at the time of such Court order for 2013.

295.   PCI is entitled to a full and complete accounting for A'lor sales of goods and products which have infringed PCI's Trademarks from 1992 to the present.

## **PRAYER FOR RELIEF**

**WHEREFORE,** PCI demands that a judgment be entered against A'lor:

(A)   For the first cause of action designated "Trademark Counterfeiting Under §§ 32, 34, 35 of the Lanham Act; 15 U.S.C. §§ 1114(1), 1116(d), 1117(b)-(c)" a permanent injunction barring A'lor from infringing and counterfeiting the Trademarks, and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, and a sum equal to three times such profits or damages (whichever is greater), pursuant to 15 U.S.C. § 1117(b), but in an amount not less than $10 million, and for an award of $2 million per counterfeit trademark per type of goods sold, offered for sale, or distributed pursuant to 15 U.S.C. § 1117(c)(2), plus the attorneys' fees, interest, costs, and expenses of this action;

(B)   For the second cause of action designated "Infringement of Registered Trademarks, 15 U.S.C. § 1114 / Lanham Act § 32" a permanent injunction barring A'lor from infringing the Trademarks, and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, but in an amount not less than $10 million, plus the trebling of actual damages and an award for attorneys' fees, interest, costs, and expenses of this action;

(C)     For the third cause of action designated "False Designation of Origin, Passing Off & Unfair Competition, 15 U.S.C. § 1125(a) / Lanham Act § 43(a)" a permanent injunction, pursuant to 15 U.S.C. § 1116, barring A'lor from infringing the Trademarks and passing off PCI's goods as A'lor's products, and, pursuant to 15 U.S.C. §§ 1117(a) and 1118,  for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, but in an amount not less than $10 million, plus the attorneys' fees, interest, costs, and expenses of this action;

(D)     For the fourth cause of action designated "Trademark Dilution, 15 U.S.C. § 1125(c) / Lanham Act § 43" a permanent injunction, pursuant to 15 U.S.C. § 1116, barring A'lor from infringing and diluting the Trademarks, and pursuant to 15 U.S.C. §§ 1117(a) and 1118,    for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, but in an amount not less than $10 million, plus the attorneys' fees, interest, costs, and expenses of this action;

(E)     For the fifth cause of action designated "Unfair Competition" in an amount not less than $10 million and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, plus the attorneys' fees, interest, costs, and expenses of this action;

(F)     For the sixth cause of action designated "Unjust Enrichment" in an amount not less than $10 million and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, plus the attorneys' fees, interest, costs, and expenses of this action;

COMPLAINT; AND DEMAND
FOR JURY TRIAL
-51-

(G)     For the seventh cause of action designated "Breach of Contract" in an amount not less than $10 million and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, plus the attorneys' fees, interest, costs, and expenses of this action;

(H)     For the eighth cause of action designated "Breach of the Implied Covenant of Good Faith and Fair Dealing" in an amount not less than $10 million and for an award of A'lor's profits and an order that PCI recover A'lor's illicit profits and damages arising out of the unlawful acts of deception and infringement described in this Complaint, plus the attorneys' fees, interest, costs, and expenses of this action; and

(I)     For the ninth cause of action designated "Accounting" an order requiring A'lor to provide a full and complete accounting of all sales of CHARRIOL Products from 2010-2012 and for the quarters which have elapsed in 2013 and during the period of this lawsuit, and for an accounting of A'lor sales of goods which infringed PCI's Trademarks from 1992 to present.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Philippe Charriol International Limited demands a trial by jury on all issues so triable.

DATED:  May 30, 2013                    **PERKINS COIE** LLP


By: *s/ N. Thane Bauz*
N. Thane Bauz, Bar No. 188439
TBauz@perkinscoie.com

Attorneys for Plaintiff
Philippe Charriol International Limited

LEGAL26867450.1